All right, we'll call it the second case, Banco Popular v. Kanning. And Mr. Turbeville, you're up first. Thank you, Your Honor. May it please the court. My name is Donald Turbeville. I'm attorney for Banco Popular, North America, the appellate in this case. In the courtroom with me is my senior litigation associate, Deborah River. The question presented before the court today by Banco Popular's main brief is, did the district court err in finding that the assignment of a life insurance policy as collateral for an SBA loan is not enforceable against the personal guarantor because the assignment did not comply with the terms of the policy? I think more succinctly stated, must an assignment not otherwise prohibited by the policy be enforceable against the insurer to be enforceable against the assignee's heir? The court below found that if it was not enforceable against the insurer, it wasn't enforceable against anyone. We believe the court erred in that regard. The underlying transaction before the court was a commercial lending transaction. It was to be funded by an SBA guaranteed loan. That guaranteed loan was extended on certain conditions to secure repayment of that loan. In the case before the court, we're talking about a $695,000 SBA loan, and Mr. and Mrs. Canning were guarantors of that loan. Were there to be a valid assignment, putting aside the question of whether there was an anti-assignment clause in the policy, there has to be a meeting of the minds. Yes, sir. That's where I have a concern because originally the bank wanted a life insurance policy for $695,000. On the life of Mr. Canning, I assume president or owner of this jewelry store, Canning said, I can't provide you with a $695,000. I can give you a $500,000 with USAA. The bank apparently consented to that, and in fact, Canning delivered the policy to the bank. Yes, sir. Yet after the closing on the 3rd of December 2007, the bank contacts Canning and says, you owe us a policy for $695,000. How do you explain that inconsistency vis-a-vis a meeting of the minds? Well, Your Honor, I think the meeting of the minds is fully met in the execution of the assignment, which is found at the record on appeal at number 999 through 1000. I think that's the clear expression of the meeting of the minds. How do you explain telling them you owe us a policy for $695,000, just incompetency? The answer is I can't explain it, Your Honor. I cannot. Okay. Second question, why are you bringing a declaratory judgment action on a limb? It is to determine the rights of the parties in relation to the policy and the assignment. Well, why do you need the guise of a declaratory judgment action? You say we owe the money under the policy. We have a lien on it. Why do we need this declaratory judgment clause? I don't think that— Why can't you just enforce your lien? Well, I think we were attempting to do just that. Is the declaratory judgment action superfluous? I don't think it's superfluous. I think either action would stand on its own. All right. Why are you suing for conversion instead of just enforcing your lien? Because the race, the proceeds of the policy were taken by the guarantor, Mrs. Cannon. It's an act of conversion. So against what do you have a lien? We have a lien against the race, the money that she converted, because it's an identifiable proceed. So you're seeking damages, though, in addition to the policy proceeds, the $500,000? They're identical. What damages are you seeking other than $500,000? The proceeds of the policy, nothing further. All right. And that meeting of the minds, Your Honor, we believe was fully expressed by the various documents that were signed by the Cannings in connection with the extension of this loan. They signed, obviously, the note itself, but that's not relating necessarily to the insurance proceeds. They signed personal guarantees. The SBA took a blanket lien on all the assets of the corporate borrower, and also as a condition of the loan, there is the assignment of a life insurance policy, which is standard with SBA lending. The lender's checklist indicated that Banco Popular expected the Cannings to provide a copy of the policy, which they ultimately did. What do you mean ultimately? I thought they did so before the closing. I believe that the policy was actually delivered post-closing. I want to say I think it was on the 24th of December of 2007. I think it was a post-closing transaction that they actually got the policy and a copy of the assignment of the contract. We believe that, again, meeting of the minds was certainly met in the context of the term sheet that was provided to the Cannings by Banco Popular, which the Cannings both signed. The loan commitment letter also indicated that there would be a necessity of a life insurance policy and an assignment of that policy. And there was, as the Court noted, subsequently a loan file change memo, where when it was determined that the original amount of the policy that was to be pledged was not available, that the bank agreed and the Cannings agreed to allow an assignment of an existing policy, which we now know as the USAA life policy with a face value of $500,000. Is the lien on the policy? To whom does the lien apply? Well, the lien applies in favor of Banco Popular. The lien applies to the benefits, the rights, the proceeds under the policy itself. Is it applicable to USAA? In other words, USAA should have not dispersed the funds to Ms. Canning? And, Your Honor, that's exactly the point that we take exception with. It isn't that Banco Popular attempted and failed to enforce the assignment against USAA. In fact, what ultimately happened was Mr. Canning's passing was unknown to Banco Popular until Mrs. Canning later filed a Chapter 7 bankruptcy and listed in her schedule that she had assets in the form of a survivor's account at USAA, in which contained the proceeds of the life insurance policy. So Banco Popular never attempted to enforce the assignment against USAA. It was unaware that Mr. Canning had passed away. And the assignment didn't meet the requirements of USAA, did it? It did not. That's correct. Let me ask you this. Two days after the closing, as I understand it, Banco wrote Canning saying you need to redo this assignment and make it to a different Banco entity, didn't it? Well, I don't think it was a different entity. I think it was more, frankly, I'd say form over substance. I think the point that the bank was made was that it should not be made. The name of the bank was not Banco Popular N.A., but Banco Popular North America. I don't think that there was any discrepancy regarding the anticipated lender. It was merely a formality of how my name is spelled. And did they do that? Ultimately, the assignment, which, again, is found in the record at 999 through 1000, ultimately identifies Banco Popular N.A. So the correction was not made by Mr. Canning in connection with the assignment itself. But yet there's no discrepancy and there's no evidence in the record that the assignment was rejected or failed because it was lender A instead of lender B or that there wasn't a meeting of the minds. In fact, I believe that the record clearly shows uncontroverted summary judgment evidence that there was, in fact, a meeting of the minds, that the loan was expressly contingent upon the pledge of a life insurance policy. That might be the case, but for the fact that post-closing, the bank sends this letter to Canning saying you need to give us a policy for $695,000. Again, this may just be gross incompetency on the part of the bank, and it stumbled all along in its delays, et cetera, et cetera, but it just raises an issue that they're asking for $695,000 policy after he's already delivered one to them for $500,000. As I said, Your Honor, I won't venture an explanation. It's not in the record below, and I won't venture one myself. But I think that the most clear expression of the meeting of the minds is, in fact, the assignment that Mr. Canning executed before a notary publican delivered to the bank, along with the policy. Well, that's a strong point in your favor. Now, after the bankruptcy proceeding, this was another fact that I found surprising. When Mrs. Canning's Chapter 7 proceeding was taking place and the bank made an appearance but did not assert a claim or engage in an adversary proceeding, the position of the bank being we had a lien on the proceeds or we had a lien on the policy, whichever one is applicable, we didn't need to assert it there. It passes through bankruptcy, and we can assert it post-bankruptcy. Why, after the bankruptcy proceeding, if it's in the record, did— Why, after the bankruptcy proceeding, did Banco Popular contact USAA and say, Have you paid the proceeds to Ms. Canning, or have you paid the proceeds on this policy? I think it was in an effort to try to do some due diligence on determining what exactly happened. I mean, certainly— Hadn't all this been clarified in the bankruptcy proceeding? Clarified from one perspective, the information that we had from Ms. Canning, but we had no information from USAA. But you waited a while to ask USAA. The timing on that I can't speak to, Your Honor. I think the timing at that point, we had reason to believe, Banco Popular had reason to believe that USAA had in fact paid out the proceeds. That's true. The inquiry to USAA after the fact was more fact-finding and more just trying to do the due diligence to figure out exactly what happened. But that's not, I don't believe, a feature of the record below. But that's my best response to the court on that issue. The district court incorrectly, in our opinion, concluded that the life insurance policy prohibited an assignment of the policy owner's interest in the policy. And the court below relied heavily on an opinion in which was an assignment of a letter of credit. And in that letter of credit, there was the following express language. This commitment is non-transferable or assignable to any other individual, corporation, or entity unless specifically approved by Bankers Capital Corporation. Thus, the court concluded, any attempted assignment, whether absolute or collateral, would be of no force in effect. But, in fact, the USA Life policy did not have an anti-assignment provision. What it had in it, and this is at the record at page 1046, the policy term that provides that to be binding on us, USAA, certain things must happen. To be binding on USAA. Would that negate a lien? No, sir. I think not. This would make a great law school commercial paper exam or something. But, again, I'm mystified as all the stumbles along the way by the bank. But why wouldn't that make it a lien? Why wouldn't that be necessary for there to be a lien? Your Honor, I think it's not dissimilar from an Article IX transaction where you have a borrower who executes a security agreement, but then to perfect, you have to file a financing statement with the Secretary of State's office. Well, if that financing statement isn't filed, that doesn't mean that it's not a secured transaction. It doesn't mean that the borrower or the grantor of that security interest isn't bound. It's a matter of who you can enforce that against. You can't enforce that against a bona fide purchaser for value or a buyer in the ordinary course of business. So, I think it's not dissimilar from that. The cannings were bound by the assignment. Mr. Cannings errs by the express language of the assignment, even if USAA was not. But to conclude that that policy, the USAA life policy, had an anti-assignment clause is an error. It's an error of law. I'm almost out of time. I would just ask the Court also to conclude that the case before the Southern District of Texas, Massachusetts Life Insurance v. Sanders, is a case that I think is very much on point and is determinative of many of the issues in this case. Okay, thank you very much. Thank you. We have some time left for rebuttal. Okay, Mr. Tyler. Good morning, Your Honors. It's a pleasure to be here. My name is Robert Tyler. I have the privilege of representing Cynthia Canning. I listened to some of the Court's questions. Mr. Tyler, why do you think this is an anti-assignment clause when it says nothing about an assignment is void or you can't make an assignment or you can't transfer an interest, et cetera? All it says is for this to be effective against USAA, you have to do A, B, and C. And when USAA pointed out errors, it was we don't have the signature of the S&E, which would be the bank, and we don't have their tax number. Well, one reason I— Which would not go to—you can't assign this. It's simply, you know, we need the signature of the S&E so we'll know to whom to pay it, and we need their tax number for our own tax purposes. My perspective on USAA's motion to dismiss that they filed was that they felt it was an anti-assignment clause. And my perspective on the law is— What they think really doesn't matter. What's written is what matters. Well, what's written is what matters, but the insurance companies, I believe, and under the law, have the right to control whether that contract that they're a party to, that they're the obligor on, they have the right to decide whether or not that contract that they are responsible for can be assigned to somebody else. And in this case, what they said was it can be assigned, but only if we say it can, only under certain circumstances. And I believe that's why it is an anti-assignment clause, because they have the right to control how— Tell me why you think it says only if we say it's okay. Because— It says for this to be effective against USAA or words to that effect. It does say that, but it says this policy may be assigned only as permitted by the policy. And what is permitted by the policy? It means it has to be on a form acceptable to them. It has to be notarized. It has to be signed by all parties. And part of that is because I believe they have reporting obligations under the federal government, under the tax laws. They've got reporting obligations, so they need to know who—they're going to be responsible for paying money to somebody, and they want to know who it is. They're going to be responsible for paying money to someone, and they want to make sure it's to the right person. But it's not that they can't make an assignment unless all the I's are dotted and the T's are crossed, like giving them a tax number. It's for their protection. Yes, sir. It's for their protection. It's not precluding an assignment. If they wanted to preclude an assignment, they would have said you cannot assign this policy. They want to only be sure—they want—I think that's certainly valid. I do think they want to only have an—they only want an assignment to be valid if it follows their prescribed procedures. But the policy didn't say for this—for an assignment to be valid, it must be approved by us. That's ordinarily the language you would expect. I mean, obviously they don't want to pay twice, and that's what they're trying to avoid. That is absolutely correct, sir. They do not want to pay twice. They don't want to be sued either. No, they don't. Which in this instance they were. But I just don't see an anti-assignment clause at this point. Okay. Well, you know, I think that fundamentally what the district court said was that— You know, it really doesn't matter what the district court said since this is on summary judgment. This is de novo review here. Obviously, we're interested in the district court's opinion. Right. We've got to make this decision ourselves. There's no deference. And, again, what I was going to say was that Banco Popular did not have the right to immediate possession of the policy funds. Why not? It had the policy. Well, first of all— If that, in fact, is what the assignment was all about. Again, I've got concerns about this post-closing communication. Mr. Turbeville said that the policy was delivered December 24. I just want to go back. What they say in their brief and when they cite to the Record on Appeal, they say it was delivered November 24, which was prior to the closing. That's what I thought. And in terms of the meeting of the minds, the issue that I have with that, there's several issues. One is, as you point out, Chris Canning made an offer of assignment on November 22, I believe, maybe 21st, sent that to USAA, signed and filled out by him. That's the document that they're suing on, that document that he sent to USAA-Life, and they sent back to him and said that's not sufficient. That is not an assignment. What is the assignment that he delivered to USAA that counsel for the bank is referring to? He said it was delivered either at closing or after closing. It was delivered November 24, and it's that insurance policy. The assignment or the policy? I'm sorry? I'm talking about the assignment. When was the actual written assignment tendered to the bank? The document that they're suing on was sent to USAA on November 21st. It was sent back to Mr. Canning. He went to the bank and said they won't accept it unless you sign it. So then he took that document and gave it to them. I believe it was November 27 of 2007. On November 29, they gave it back to him and said we're not going to sign it because our name is wrong, which in my opinion is a rejection of that document. You modify it, maybe we'll sign it, but that document we are not going to sign. That's the document that they're suing on. They got it November 29. On December 3, he signed the post-closing affidavit. On December 3, BEMK, the diamond company, promised to assign a policy in future, $695,000, making them the beneficiary assigned absolutely and not as collateral. So your question is the meeting of the minds. At the closing, they didn't think the operative document was the exhibit that they're offering today. Closing was on November 21? Yes, sir. No, the closing was December 3. Sorry, I misunderstood. Yes, the closing was December 3. Thank you. November 21 is the date of the document assigning the policy, right? November 21 was the date Christopher Canning signed the document and sent it off to USAA. Isn't that the document they're suing on? Yes, that's what we call the purported assignment because whether it's an assignment or not depends on whether it's valid, in my opinion. And the reason that you say it's not valid is because the policy prohibited it from being assigned. Actually, I think it's not valid for a wide variety of numbers. What else? The main reason I think it's not valid is because USAA Life rejected it. They rejected it when they contacted USAA Life in February of 2010 and said, what's the status? USAA Life said it's not valid. Here, we'll send you some documents. Have your lendee fill these out and send them in. You fill them out and send them in. Somebody's got to send these in to us because we're not going to have it. The other thing that Mr. Turbeville said or didn't say is the SBA has a requirement that the life insurance policy assignment be on file at the home office of the insurance company. This one never was because they never accepted it. Well, you don't raise in your brief, as I recall, that because there's some SBA violation, the assignment's not valid. No, I don't. And I don't think the SBA violation has anything to do with the validity of the assignment. I'm just saying they continue to say this was a requirement of the policy. The requirement of the policy was that it be on file. Now, some life insurance policy should have been assigned. There never was one. And to your point, Judge Barksdale, maybe it's an incompetency. I don't know. But I do know that you can't, nobody can. If I were here making an argument that said the closing documents don't matter, what matters is something that only one party signed and the other party rejected before the closing. That's the operative document. If I were making that argument, I would be concerned about being laughed out of court. A bank cannot come in here and say the closing document doesn't matter. Jackson Walker was Banco Popular's attorney at the closing. They went through and sent a letter to their client saying these are all the documents in the closing packet. The post-closing affidavit is listed there. They're not supposed to fund the loan unless they have an assignment. They obviously did not think they had an assignment on December 3rd. And yet, and this is one of the reasons why we have a contempt claim in this case, and yet they knew they did not have an assignment as of December 3rd. And yet my client has been through two and a half years of litigation over this when they know beyond any doubt that this document that they are suing on, they did not believe to be a valid assignment on December 3rd of 2007. USAA told them it wasn't a valid assignment on February 24th, 2010. And on December 7th, I believe, of 2012, USAA again told them that's not valid. Well, valid as to who, though? Valid as to USAA? You know, I've been asking that question from the beginning of this case. How could it possibly be valid as to anybody else if it's not valid as to USAA? This is an assignment of rights in a contract. If you have—the person that owes obligations in this contract is USAA life. If it's not valid as to them, how on earth can it be valid as to anybody else? If I'm entitled to receive benefits from a contract from A and I'm B, I can assign my right to those benefits without even talking to A unless A in its contract says you cannot assign the benefits that I've given to you in this contract. I mean, what's wrong with that? I mean, is there something wrong with that? I'm not sure I understand your question, sir. Well, if B is owed benefits in a contract from A, B can assign those benefits to C unless there's something in the contract between A and B that prohibits that. Okay. In general, that's true. In the common law, that is absolutely correct. However, the Texas Insurance Code says that you can only assign as permitted by the policy. And in this case, the policy says this is how you assign. You've got to follow this procedure. So I believe the Texas Insurance Code, in conjunction with the policy itself—and the other thing about that is this purported assignment itself in the fine print says that it's subject to the policy terms. Therefore, it cannot—USAA says—they do say that it won't be bound. But I believe in this case this is, in fact, an anti-assignment clause because the assignment—the purported assignment itself refers back to the policy and says it's subject to its terms. And its terms are—the way that you assign the policy is by doing A, B, C, and D. And it's not onerous. But they do want to know if they've got to pay somebody money, they've got to pay the right person. What is the significance of the fact that Banco held the policy itself? Well— The policy was delivered to Banco. That's—to me, that's a fascinating theoretical question because— Fascinating what? A fascinating theoretical question because the difference between an assignment and a pledge—an assignment doesn't require that the policy be transferred. A pledge by common law does. The Texas Insurance Code says that assignments can be—must comply with the assignment statute. But isn't the fact that he delivered the policy to Banco—isn't that a strong indication that there was a meeting of the minds that this is the policy we're talking about? It happened on November 24th. And on November 24th they were getting ready for closing. And on November 24th they were—they had—Mr. Kenning had already signed off on the purported assignment and sent it off to USAA. On November 24th, it was before the closing. November 24th was before Banco Popular said we're not going to sign that document. So, yes, I mean it certainly is a strong indication of an intention to do something. But the question in this case is whether that something was ever consummated. Wanting to do something isn't the same thing as actually doing something. And it's pretty clear that they never actually did it because if they'd actually done it, they'd have given it to USAA and we wouldn't be here. Well, quite often—and I think we could take judicial notice of this, but this is just part of my question. I recall in the, quote, olden days, close quote, when you were issued an insurance policy, say a life insurance policy, they told you to make sure you secure this and take good care of it, et cetera, et cetera. So is it in the record that when Ms. Canning applied to be—applied for the benefits of this policy, did USAA say to her we will pay the policy once you deliver it to us? No, sir. No request for the policy from USAA? No. Is that in the record? It's not in the record, but— Well, then— You asked me if it was in the record. I said no, sir, it's not. Well, they say they have it. They never gave it to her. I mean if they have it, how could she give it to them? I mean we live in an electronic age where originals of policies, I don't know that insurance companies require them anymore. What is in the record is that they asked her to fill out a claim form. She filled out a claim form and sent it in. And I want to point out something that I think is critically important. In order for—the bankruptcy discharge affects everything in this case. Banco Popular was notified of the bankruptcy because she was a personal guarantor, and she discharged her debt to Banco Popular. They knew when she filed the lawsuit that she had filed this bankruptcy, and in her schedules, she scheduled the insurance money. They knew that she had received the insurance money when they were notified. This is a conversion claim, as you point out. It's not a suit to enforce a lien. A conversion claim is a personal tort. They're not suing her for a race. They're suing her for $500,000. Declaratory judgment asks for a determination whether they have a lien, doesn't it? They ask for declaratory judgment about who has—whether the assignment is valid, again, as to who. But they're asking for a declaration that it's valid, and they're also asking for a declaration now on her house. But when they first filed this lawsuit for an equitable lien, whatever that means, on her house, their—but their claim is for conversion. And their prayer is for a judgment in the amount of $500,000. How can that possibly be, by definition? Well, to me, their claim is they have a lien on the proceeds, and they follow the—they can follow the proceeds of the policy. They want a declaratory judgment saying that. But their lien is actually—I just want to say this because, to me, it's always been troubling to me about this case. They will not tell you ever that they ever had the right to immediate possession of this money from USAA. USAA did not owe them a nickel. How can Mrs. Canning convert that if they didn't have the right to immediate possession from USAA? How on earth can suddenly a right to immediate possession spring into life when it goes into her hands? Well, if their assignment is valid, they did have a right to immediate possession. From USAA? Yes, sir. If it's valid, they do, but it's not. They'll never tell you it was valid as to USAA. USAA was on notice of it. No, the assignment from the Cannings to them is valid, arguably. Valid as to USAA? No, sir. The assignment from the Cannings—and Mrs. Canning also apparently signed this assignment. No, sir. Absolutely not, sir. Let me finish. We got one or two facts up in the air here, but that was what I also had a question about. I read in the briefs that the bank required not only Mr. Canning but Mrs. Canning to sign the assignment. We'll look at it in the record. But in any event, assuming the assignment was valid from Mr. Canning to the bank, the bank stands in Mr. Canning's shoes and has a right to the money on the policy at his death. So why didn't they have a right to immediate possession of the funds from USAA? Okay. Mrs. Canning, absolutely, and there's no allegation that she ever did assign. Well, again, we'll look at the assignment. Excellent. If Mr. Canning signed the assignment and it was valid, he would not have the right to the benefits. Agreed. The bank would have the right to the benefits from USAA. I agree with that if it's valid. Why didn't they have a right to immediate possession from USAA? You keep telling us they didn't. They claim they didn't. I've never heard them say that they had ever had a claim against USAA. They have never said that. They say that the bank was discharged by payment to the beneficiary. The bank is only discharged if they're on notice, if they're not on notice of a valid assignment. They're clearly on notice of this document because they had it. Again, we're maybe taking up undue time. They maybe didn't have a legal remedy against USAA. They didn't. But they did have the right to the immediate possession if they could show USAA, look, here's our assignment. Give us the money. And the critical thing to me is USAA told them it wasn't valid. They never said it was. If they had told USAA they thought it was valid, USAA would have interpled the funds because they're going to be careful and conservative how they do things. They never told USAA live that they thought the assignment was valid. Thank you very much. Thank you, sir. Okay, Mr. Turbeville. Thank you, Your Honor. Mrs. Canning did not sign the assignment. I think more importantly to the issue of the anti-assignment clause, if there's any question left, the assignment form found at Record 999 through 1000 is USAA Life's form for an assignment. It's not a form that Banco Popular drafted and sent to the Cannings and said sign this and send it to USAA. It's a USAA Life canned form. The fact that Mrs. Canning didn't sign it is of no consequence. I mentioned earlier the decision in the Sanders case, Southern District Court of Appeals, 2011, and District Court Judge Miller held in that case found that the assignment was enforceable against the beneficiary, regardless whether the assignment was accepted by the life insurance company. That's exactly what we have here. Exactly what we have here. And the court has made mention of a meeting of the minds, and I would go further to say not only was there a meeting of the minds, there was consideration given. The loan was extended. They got what they bargained for. Banco Popular did not. What do you say to counsel's argument that Banco never had the right to get the proceeds of the policy from USAA upon Mr. Canning's death because the assignment was not valid as to USAA? Well, the short answer is we'll never know because USAA had paid out the proceeds by the time we found out about Mr. Canning's death. Does that affect your lien, though, the fact that you weren't entitled to the proceeds immediately from USAA? I believe we were entitled to immediate possession of the proceeds, period. Whether we had a remedy against USAA is a different question. But it's a question that's not determinative in this case because USAA, by the time we found out about it, USAA had already paid out. And whether or not USAA asked for a copy of the policy or not, what we do know is that Ms. Canning, in making her application, and this is found at record number 1227, filled out a claimant statement and in answer to the question, has this policy been pledged as collateral for a loan? If yes, with whom? This is USAA's form. Answer, no. Let me ask you this. If you were writing our judgment, how would you write it? I would write it such that Banco Popular's summary judgment should have been granted by the district court. And because there is no material fact issue here, there's cross motions for summary judgment, the court should grant Banco Popular the relief requested in its summary judgment. What is that? Well, we're asking for a finding that the proceeds were converted by Mrs. Canning, and we're asking for an equitable lien on those proceeds and the use of those proceeds. Including her home that she used the proceeds to purchase. Essentially, we were an involuntary purchase money lender. That is the truth of the matter. We are the mortgagee of that house. We didn't intend to be so, but we are. Because she took our money and bought a house. Diversity jurisdiction is the gift that keeps on giving. What are the elements of conversion there? You don't have to have an intention to deprive somebody else of property? Well, you have to have intent. It's not a tort of cyanide. I mean, you don't have to have that level. I mean, I have to, if I'm standing here and this microphone were to fall in my pocket and I don't notice and I just turn and walk out, I don't know that that would be a conversion. But if I pick it up and put it in my pocket and walk out, yeah, well, I've converted. What if she honestly thought the assignment was not valid and she accepted the money? I mean, would that be a conversion? Well, we must say that it is because the assignment was valid as to her. The fact that she didn't believe it was valid doesn't mean that she has the right to the property. The question is, did Banco Popular have a legal right to the property by virtue of the assignment? And we say, of course we did. And that gets back to my original question of why we're even mentioning conversion instead of just we're entitled. We've got a lien and we're entitled to it, the proceeds. Your Honor, belt and suspenders, it is common in my practice. We're speaking about the attorney who filed the litigation below, that's me. It's common in my practice to couple a conversion claim with a declaratory judgment. Okay. Thank you very much. Thank you, gentlemen. We have your case.